## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| | : | |
| **WAEL SHARAYDEH** | : | **Case No.: 1:23-cv-409** |
| **5000 MONTGOMERY ROAD** | : | |
| **CINCINNATI, OHIO 45212** | : | |
| | : | **Judge: _____** |
| **AND** | : | |
| | : | |
| **ISMAIL SHARIDA** | : | |
| **7233 SUNDANCE CIRCLE** | : | |
| **WEST CHESTER, OHIO 45069** | : | |
| | : | **Civil rights complaint with** |
| **AND** | : | **jury demand:** |
| | : | |
| **LEBANON DISCOUNTS, INC.** | : | **42 U.S.C. § 1983: First,** |
| **DBA VIP SMOKE SHOP** | : | **Fourth, Fifth, and Fourteenth** |
| **726 EAST MAIN STREET, SUITE 28** | : | **Amendments;** |
| **LEBANON, OH 45036** | | **Federal Replevin Claims** |
| | | |
| **AND** | | **State Replevin and** |
| | | **Conversion Claims** |
| **FRANKLIN DISCOUNTS, INC.** | | |
| **DBA VIP SMOKE SHOP** | | |
| **512A CENTRAL AVE.** | | **And Injunctive Relief** |
| **FRANKLIN, OH 45005** | | |
| | | |
| **AND** | | **Jury Demand** |
| | | |
| **KING COURT DISCOUNTS, INC.** | | |
| **DBA VIP SMOKE SHOP** | | |
| **2364 KINGS CENTER CT.** | | |
| **MASON, OH 45040** | | |
| | | |
| **MASON ISLAND, INC** | | |
| **DBA VIP SMOKE SHOP** | | |
| **1087 READING RD.** | | |
| **MASON, OH 45040** | | |
| | | |
| **AND** | | |

**VIP DISTRIBUTION DISCOUNT
INC.
5000 MONTGOMERY RD.
CINCINNATI, OH 45212**

**AND**

**CENTERVILLE DISCOUNT,
INC.
9144 DAYTON LEBANON PIKE
CENTERVILLE OH 45458**

**AND**

**SPRINGBORO DISCOUNT, INC.
5410 N SPRINGBORO PIKE
DAYTON OH 45449
AND**

**LANDON DISCOUNTS, INC.
2906 US 22/3 MAINEVILLE,
OHIO 45039**

**AND**

**WALAA SHARADIA
7233 SUNDANCE CIRCLE
WEST CHESTER, OHIO 45069**

**AND**

**K. SHARDIA, A MINOR, BY AND
ISMAIL & WALAA SHARIDA,
HER PARENTS, NEXT BEST
FRIENDS, AND CUSTODIANS
7233 SUNDANCE CIRCLE
WEST CHESTER, OHIO 45069**

**AND**

**H. SHARIDA, A MINOR, BY AND
ISMAIL & WALAA SHARIDA,
HER PARENTS, NEXT BEST
FRIENDS, AND CUSTODIANS
7233 SUNDANCE CIRCLE
WEST CHESTER, OHIO 45069**

**AND**

**MARIA JAX ORTIZ**
**C/O COUNSEL**
**315 S. MONUMENT AVE**
**HAMILTON, OH 45011**


        **Plaintiffs,**

    **v.**


**WARREN COUNTY, OHIO**
**C/O COUNTY**
**COMMISSIONER'S OFFICE**
**406 JUSTICE DR.**
**LEBANON, OH 45036**

**AND**

**WARREN COUNTY, OHIO**
**SHERIFF'S DEPARTMENT, A**
**GOVERNMENT AGENCY**
**C/O SHERIFF**
**822 MEMORIAL DR.**
**LEBANON, OH 45036**

**DETECTIVE DAN**
**SCHWEITZER, IN HIS**
**INDIVIDUAL AND OFFICIAL**
**CAPACITY AS DETECTIVE FOR**
**THE WARREN COUNTY**
**SHERIFF'S OFFICE**
**822 MEMORIAL DR.**
**LEBANON, OH 45036**

**AND**

**MONTGOMERY COUNTY,**
**OHIO**
**C/O COUNTY**
**COMMISSIONER'S OFFICE**
**6750 WEBSTER ST.**

3

**DAYTON, OHIO 45414**

**AND**

**MONTGOMERY COUNTY,
OHIO SHERIFF'S
DEPARTMENT, A
GOVERNMENT AGENCY
C/O SHERIFF
345 W. SECOND STREET
DAYTON, OHIO 45422**

**AND**

**GREENE COUNTY, OHIO
C/O COUNTY
COMMISSIONER'S OFFICE
35 GREENE ST.
XENIA, OH 45385**

**AND**

**GREENE COUNTY, OHIO
SHERIFF'S DEPARTMENT
C/O SHERIFF
105 E. MARKET ST.
XENIA, OHIO 45385**

**AND**

**WEST CARROLTON, OHIO
C/O CITY MANAGER
300 E. CENTRAL AVE,
WEST CARROLTON, OH 45449**

**AND**

**WEST CARROLTON POLICE
DEPARTMENT
C/O CHIEF OF POLICE
300 E CENTRAL AVE.
WEST CARROLTON, OH 45449**

**AND**

**OFFICERS JOHN DOES 1-10**

**AND**

**OFFICERS JANE DOES 1-10**

        **Defendants.**

Comes Now Plaintiffs, and for their Complaint state as follows:

## PARTIES JURISDICTION AND VENUE

1.     This is an action for injunctive relief and damages pursuant to 42 U.S.C. § 1983 based on continuing violations of Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1334 based on 42 U.S.C. § 1983 and questions of federal constitutional law. Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. Supplemental jurisdiction over Plaintiffs' state law claims is pursuant to 28 U.S.C. § 1367.

2.     Venue is proper in the Southern District of Ohio in that the events and conduct complained of herein all occurred in the Southern District of Ohio.

3.     Plaintiff Wael Sharaydeh, is an individual and resident of the State of Ohio.

4.     Plaintiff Ismail Sharida, is an individual and resident of the State of Ohio.

5.     Plaintiff Walaa Sharida, is an individual and resident of the State of Ohio.

6.     Plaintiff K. Sharida is a minor child of Walaa & Ismail Sharida, and resident of the State of Ohio.

7.     Plaintiff H. Sharida, is a minor child of Walaa & Ismail Sharida, and resident of the State of Ohio.

8.    Plaintiff Lebanon Discounts, Inc., is an Ohio corporation in good standing doing business in Warren County, Ohio.

9.    Plaintiff, Franklin Discounts, Inc., is an Ohio corporation in good standing doing business in Warren County, Ohio.

10.   Plaintiff, King Court Discounts, Inc., is an Ohio corporation in good standing doing business in Warren County, Ohio.

11.   Plaintiff Mason Island, Inc., is an Ohio corporation in good standing doing business in Warren County, Ohio.

12.   Plaintiff VIP Distribution Discount, Inc., is an Ohio corporation with its primary business located in Hamilton County, Ohio.

13.   Plaintiff Centerville Discounts, Inc., is an Ohio corporation with its primary business located in Centerville, Ohio.

14.   Plaintiff Springboro Discounts, Inc., is an Ohio corporation in good standing doing business in Greene County, Ohio.

15.   Plaintiff Landen Discounts, Inc., is an Ohio corporation in good standing doing business in Warren County, Ohio.

16.   Plaintiff Maria Jax Ortiz is an individual and employee of one of the corporate Plaintiffs and resident of the State of Ohio.

17.   Defendant Warren County, Ohio is a county government organized under the laws of the State of Ohio.

18.   Defendant Warren County Sheriff's Department is a government agency located in Warren County, Ohio.

19.  Defendant Detective Dan Schweitzer is an individual resident of the State of Ohio, and also a detective, employee, agent of the Warren County, Ohio Sheriff Department.

20.  Defendant Montgomery County, Ohio is a county government organized under the laws of the State of Ohio.

21.  Defendant Montgomery County Sheriff's Department is a government agency located in Montgomery County, Ohio.

22.  Defendant Greene County, Ohio is a government organized under the laws of the State of Ohio.

23.  Defendant Greene County Sheriff's Department is a government agency located in Greene County, Ohio.

24.  Defendant West Carrolton, Ohio is an Ohio municipal corporation with offices in West Carrolton, Ohio.

25.  Defendant West Carrolton Police Department is a government agency located in West Carrolton, Ohio.

**PRELIMINARY STATEMENT**

26.  This lawsuit seeking to enjoin the unconstitutional actions of Defendants, return of property of Plaintiffs, enjoin ongoing abuse, and to protect a status quo that has been in place since 2020, when the Ohio legislature legalized hemp and hemp products, including all derivatives therefrom.

27.  Plaintiffs are bringing constitutional causes of actions against Defendants seeking, among other things, an order that Defendants return Plaintiffs' property, a declaration that the Defendants may not initiate or continue any

criminal enforcement actions or civil asset forfeiture proceedings against Plaintiffs or individuals based on the sale or possession of commercial products containing cannabinoids derived from "hemp" including but not limited to Cannabidiol (CBD), delta-8-tetrahydrocannibol (Delta-8-THC), delta-10-tetrahydrocannibol (Delta-10-THC), Cannabinol (CBN), Cannabigerol (CBG), and all other cannabinoids derived from state and federally legal hemp.

28. Defendants have waged an unconstitutional war on legal businesses and individual citizens operating within the law, by, *inter alia*, providing defective affidavits for warrants, seizing clearly legal property, seizing property owned by Defendants prior to their involvement in the hemp business, harassing and seizing property of Plaintiffs' family members, AND, and seizing unknown amounts of cash, without any accounting. Defendants simply listed "US Currency" as property seized, without including it on the inventories. Defendants failed to properly inventory other seized properties, including but not limited to the aforementioned cash, but products too, and at least one vehicle.

29. Defendants acted in a willful wanton and reckless manner when preparing and executing search warrants, as well as when completing the search warrant. This includes a failure to follow department and legal documentation requirements when inventorying the assets seized, depriving innocent individuals of their property and other actions to be more fully set

forth later, and related to Defendants actions in preparing, executing and completing the search warrants upon Plaintiffs.

30.   For all purposes set forth below, Defendant Detective Dan Schweitzer acted in both his individual and also in his capacity as a detective, employee, agent of the Warren County, Ohio Sheriff Department.

31.   To date, Defendant Schweitzer's warfare against Plaintiffs' legal business has resulted in over 20 raids, and confiscation of well over $500,000 in products, unknown amounts of cash, and vehicles which were purchased well before Plaintiffs entered the hemp business.

32.   Plaintiffs are informed and believe, Defendant Schweitzer contacted law enforcement in Montgomery County, Ohio and convinced their task force known as the Tactical Crime Suppression Unit ("TCSU") that Plaintiffs' were funding terrorism and selling illegal drugs.

33.   It was reported in the Dayton Daily News, the TCSU, opened their investigation into Plaintiffs after receiving information from unknown Warren County officials because Plaintiffs Wael Sharaydeh and Ismail Sharida were the owners of businesses located in Montgomery County, Ohio.[1]

34.   Defendant Schweitzer's actions were selective, targeted, willful, wanton, and reckless and were exercised with malicious purposes and bad faith.

35.   Defendant Warren County and Warren County Sheriff Department failed to properly train and supervise Defendant Schweitzer and/or failed to have

---

[1] https://www.daytondailynews.com/local/police-raid-4-smoke-shops-cite-illegal-products-store-claims-police-misconduct/APZQUZY57NAFLH3653I3GDZR2U/

proper training, supervision, and policies and procedures in place for its employees and agents.

36. As a result, without filing any criminal charges, civil forfeiture or any legal proceedings, Defendants Montgomery County and the Montgomery County Sheriff Department and/or West Carrolton, Ohio and the West Carrolton Police Department seized and/or froze all bank accounts of several Plaintiffs to include Centerville Discount, Inc., Springboro Discount Inc., and Wael Sharaydeh.

37. Since the initial seizure, Defendants Montgomery County, Ohio and/or the Montgomery County Sheriff's Department, and/or West Carrolton, Ohio and the West Carrolton Police Department have released some of the accounts, but not the accounts of Plaintiffs, Centerville Discounts, Inc., Springboro Discounts, Inc., and Wael Sharaydeh.

38. The additional atrocities of Defendants include a litany of not only constitutional violations but of actual life threating actions such as illegally seizing and keeping an employee's necessary lifesaving medication, in spite of being informed that the seized medication was outside the parameters of the search warrant, was not the property of party identified in the search warrant, and its' seizure created a life threatening medical emergency for the innocent individual the medication was prescribed for.

**THE THREAT TO HUMAN LIFE**

39. On or about April 10, 2022, unknown John and Jane Doe Defendants, raided one of the Plaintiff's stores.

40.  Acting consistent with the pattern of abusive and unconstitutional tactics utilized by law enforcement during their now, twenty-plus raids, they threatened and intimidated the store employees.

41.  During this raid, law enforcement was informed by employee, Ryhman Farah, that his necessary medication was in the back of the store.

42.  That the medication was in a container clearly labeled to identify the person for whom it was prescribed, and in all other respects lawfully identified and maintained.

43.  Mr. Farah has a potentially deadly condition and must take his medication three times daily in order to preserve his life.

44.  Without Mr. Farah's medication, he could reach acute chest syndrome and die within minutes.

45.  Acute chest syndrome is one of the leading causes of death in people living with Mr. Farah's condition.

46.  And of course, given the surge in legal drug abuse like opioids, Mr. Farah was unable to obtain a refill of his necessary medication.

47.  Despite being provided the above information of the employee's deadly disease, Defendants were too busy making fun of a religious poem written in Arabic and laughing about arresting the Taliban, to have concern for a human being's potential death.

48.  During this raid, Defendants saw a poem written in Arabic and laughed that it was "Taliban".

49.  Defendants' actions resulted in them effectively seizing, unlawfully, Mr. Farah's medication and creating a medical emergency for Mr. Farah.

50.  Plaintiffs cannot idly standby and watch a governmental agency violate its legal and constitutional rights and put an employees life in danger through this targeted, selective and malicious vendetta to close a legal business.

### THE DESTRUCTION OF THE ECONOMY

51.  Not only are Defendants' actions threatening lives and damaging the Plaintiffs, but the Defendants are also threatening to destroy an industry that is lawful under federal and state laws. The industry is valued as a multibillion impact on the US economy.

52.  Economic impact studies of the hemp derived cannabinoids, like Delta-8-THC and Delta-10-THC, have been conducted in Colorado, Virginia, and Florida.

53.  In March of 2023, the economic impact analysis in the State of Florida, concluded that hemp derived cannabinoids, was likely to have generated in excess of $10 billion in sales for the year 2022.

54.  The study stated the hemp industry supports the employment of approximately 104,000 Florida workers, paying in excess of $3.6 billion in annual wages.

55.  In October of 2022, the economic impact analysis in the State of Colorado concluded that hemp derived cannabinoids was likely to have generated in excess of $527 million in sales for the year 2022 and growing to in excess of $815 million in 2023.

56. The study stated the hemp industry supports the employment of approximately 2,600 Colorado workers, paying in excess of $136 million in annual wages.

57. In February of 2023, the economic impact analysis in the Commonwealth of Virginia concluded that hemp derived cannabinoids was likely to have generated $1.2 billion in sales in 2022.

58. The study stated the hemp industry supports the employment of approximately 4,263 Virginia workers, paying in excess of $161 million in annual wages.

59. All three studies found that economic impact on the overall United States of America supply chain for the hemp derived cannabinoids was into the billions of dollars.

## FACTUAL ALLEGATIONS

60. The *Cannabis Sativa* plant and its seeds, oils, and extracts have been harvested and consumed by humans in several forms for thousands of years, including industrial, medical, religious, and recreational purposes. The most well-known forms of the *Cannabis Sativa* plant are hemp and marijuana.

61. The *Cannabis Sativa* plant contains over a hundred naturally occurring compounds called "cannabinoids". One of the most commonly known cannabinoids is Delta-9-THC, a cannabinoid that produces psychoactive effects when consumed by humans. Other cannabinoids have become popular in recent years, including Delta-8-THC and CBD, and are

commonly purchased and used to treat pain, anxiety, and other mental and physical conditions. These cannabinoids can be ingested by smoking processed flower, vaping concentrated oil, topical creams, and infused in food and beverages.

62. Certain types of *Cannabis Sativa* plants are distinguishable from each other based on the types and quantities of cannabinoids found in the plant. Specifically, hemp has been distinguished from marijuana based on its lower quantity of certain cannabinoids, namely Delta-9-THC.

63. The most relevant cannabinoids in this case, namely CBD, CBN, CBG, Delta-8-THC, and Delta-10-THC, are naturally occurring in both hemp and marijuana plants and can be extracted from either plant.

64. For almost 50 years, the federal government and most states, including the State of Ohio, prohibited the manufacture, possession, sale, distribution, or trafficking of almost every form of the *Cannabis sativa* plant, including marijuana and hemp, and its extracts, derivatives, and cannabinoids.

65. That all changed in 2018, when Congress passed the Agriculture Improvement Act of 2018 (the "Farm Bill"). Among other things the Farm Bill legalized the cultivation, processing, distribution, and possession of "hemp" and hemp extracts. Because hemp and marijuana are both *Cannabis sativa* plants, the Farm Bill explicitly exempted "hemp" from the definition of marijuana under federal law.

66. Under 7 U.S.C. § 1639o, federal law defines "hemp" as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all

derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9-tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."

67. The federal Controlled Substances Act ("CSA") was amended to exclude "tetrahydrocannabinols in hemp" from the definition of "tetrahydrocannabinol" (THC) under 21 U.S.C. § 812 and "hemp" from the definition of "marihuana" under 21. U.S.C. § 802.

68. The Drug Enforcement Administration ("DEA") has clarified on multiple occasions that Delta-8-THC and other cannabinoids are not illegal controlled substances if they are derived from hemp and are under the threshold limit for Delta-9-THC.[2] In a letter to the Alabama Board of Pharmacy, dated September 15, 2021, the DEA responded to a request by the Board regarding the "control status" of Delta-8-THC under the Controlled Substances Act, taking the position that "cannabinoids extracted from the cannabis plant that have a delta-9-THC concentration of not more than 0.3 percent on a dry weight basis meet the definition of 'hemp' and thus are not controlled under the CSA."

69. Since passage of the 2018 Farm Bill, most states have adopted similar definitions of "hemp" to distinguish hemp and hemp products from marijuana.

---

[2] Florida Department of Agriculture and Consumer Services. Town Hall with USDA and DEA. June 29, 2021. https://www.youtube.com/watch?v=yt8oWWsoLD4. During this town hall, Sean Mitchell, the Chief of Intergovernmental Affairs at the DEA, was asked about the legality of Delta-8-THC and stated: "There's Delta-8, there's Delta-10, there's all kinds of different cannabinoids that are associated with Cannabis Sativa L. that are kind of out there... What I want to say, and be very very deliberate and clear—at this time, per the Farm Bill, the only thing that is a controlled substance is Delta-9-THC greater than 0.3% based on a dry weight basis…"

70.     In 2020, Ohio adopted the federal definition of hemp and exempted hemp and products containing hemp-derived cannabinoids from the state's criminal laws. Under Ohio Revised Code 928.01(C) "hemp" is defined as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta 9 tetrahydrocannabinol concentration of not more than three-tenths per cent on a dry weight basis." Thus, at all times relevant herein, Ohio is in full accord with the Federal law regarding the regulation of the products that are the basis of the actions alleged in this Complaint.

71.     As a result of these changes in the law, and as intended by legislators, the hemp industry, from farmers to retail shop owners, has seen rapid and expensive growth across the nation and in the State of Ohio over the last three years. Especially the manufacture and sale of oils, flower, topical creams, concentrates, and edible products containing CBD, Delta-8-THC, Delta-10-THC, and other hemp derived cannabinoids.

72.     At a 2021 USA-CBD Expo in Georgia, The Atlanta Journal-Constitution reported over 270 vendors attended the event, including CBD and Delta-8 vendors who offered samples of their products to the public. [3] The event was attended by over 7,000 people who use, distribute, or manufacture products containing hemp-derived cannabinoids. Independent Retailer, a leading

---

[3] Ariel Hart. *Hundreds of vendors peddle CBD products at Atlanta convention. Atlanta Journal Constitution.* (Jun. 11, 2021) https://www.ajc.com/news/business/hundreds-of-vendors-peddlecbd-products-at-atlanta-convention/UHUNV6Q5YJBB7LI2YNDS6KUAUU/.

publication for independent retail store owners, described it as a "completely sold-out show" where "investors, entrepreneurs, and enthusiasts alike benefited from learning about multiple topics presented by more than 70 expert speakers who shared their insights on current market trends surrounding CBD, hemp, and other high-demand alternative products..."[4]

73.    Since 2019, products containing CBD, Delta-8-THC, Delta-10-THC, and other cannabinoids generally have been considered legal in the US as long as the cannabinoids in those products are derived or extracted from a Cannabis sativa plant that meets the definition of "hemp" under O.R.C. 928, in that it has less than 0.3% Delta-9-THC.

74.    The products involved in this case uniformly contain CBD, Delta-8-THC, Delta-10-THC, and/or other cannabinoids that were extracted, isomerized, or otherwise derived from hemp plants and have less than 0.3% Delta-9-THC.

75.    Recognizing the significant changes in federal law regarding hemp and products containing hemp-derived cannabinoids, several states have recognized the legal status of CBD, Delta-8-THC, and other cannabinoids derived from hemp.

76.    Some states have explicitly recognized the legality of Delta-8-THC and other hemp-derived cannabinoids through legislation, including in states

---

[4] USA *CBD Expo A Huge Hit in Atlanta. Independent Retailer.* (Aug. 10, 2021) https://independentretailer.com/usa-cbd-expo-a-huge-hit-in-atlanta/.

like Ohio, where recreational marijuana remains illegal.[5] Other states, such as Alabama[6] and Indiana,[7] have expressly declined to amend their hemp laws to prohibit Delta-8- THC. States that have prohibited Delta-8-THC and other cannabinoids have done so explicitly, such as North Dakota, through legislation specifically prohibiting "the isomerization of cannabinoids to create isomers of tetrahydrocannabinol, including delta-8, delta-9, and delta-10." See, N.D. Cent. Code § 4.1-18.1-NEW.

77. Litigation in other states and federally has resulted in judicial opinions finding that hemp-derived Delta-8 is not a controlled substance and granted injunctions prohibiting law enforcement from initiating criminal or civil enforcement actions against businesses or individuals that possess, sell, or Delta-8 products.

78. In one recent example, the Superior Court of Madison County, Georgia ordered law enforcement to return Delta-8 products, including vape cartridges and food products, that were unlawfully seized.[8]

79. Courts in other states have weighed in as well and found that hemp-derived substances like Delta-8-THC are not illegal. In Texas, for example, the state

---

[5] Jackie Borchardt. *Ohio regulates delta-8 THC in medical marijuana products.* CINCINNATI ENQUIRER (Jun. 21, 2021 10:14 PM) . https://www.cincinnati.com/story/news/2021/06/21/ohio-regulatesdelta-8-thc-medical-marijuana-products/7578880002
[6] Megan Reyna. *Delta-8 remains legal in Alabama, but for how long?* WAAY31 ABC. (Feb. 17, 2022) https://www.waaytv.com/news/delta-8-remains-legal-in-alabama-but-for-howlong/article_acd0f9e2-8f6e-11ec-a6c8-bfce5ff8f1df.html
[7] Maddie Alexander. *Amended delta 8 bill would grant legal THC product a reprieve—for now. The Statehouse File.* (February 24, 2022). https://www.thestatehousefile.com/politics/amendeddelta-8-bill-would-grant-legal-thc-product-a-reprieve-for-now/article_07f56aec-95b4-11ec-84ad8b6c825accf0.html
[8] Dave Huddleston. *Police seized $30,000 of THC products during a raid in Georgia, now they have to give it back.* WSB-TV. (Mar. 25, 2022 10:48 PM). https://www.wsbtv.com/news/local/delta-8-products-returned-after-raid-madison-county-store/DJNM2FKYEBAGPEHQUFBCWTFLBQ/

legislature adopted the federal definition of "hemp" and excluded hemp and hemp extracts from its list of controlled substances. In November 2021, the Texas Department of State Health Services sought to add Delta-8-THC to the definition of "tetrahydrocannabinols" and "Marijuana extract." A Texas trial court granted the Plaintiff business owners and consumers' request for an emergency injunction and enjoined the State of Texas from prohibiting the possession or distribution of Delta-8-THC. The Texas Court of Appeals affirmed the injunction, and the Texas Supreme Court has declined to review that decision.

80. Similarly, on February 28, 2022, a trial court in Kentucky granted an injunction barring the Kentucky State Police from "instituting or continuing any criminal enforcement action on the basis of legally complaint Hemp…this includes any products that contain delta-8-tetrahydrocannabinol unless it contains more than 0.3 percent delta-9-tetrahydrocannabinol concentration..." The court rejected the state's arguments that Delta-8 was an illegal form of THC and found the Plaintiffs showed immediate and irreparable injury based on the "raids and arrests" by police "relating to the distribution of Delta-8."

81. For the last three years, small businesses in Ohio, including Plaintiffs, have been growing through the sale of products containing CBD, Delta-8-THC, and other hemp-derived cannabinoids. They have done so openly and publicly given the fact that Ohio has legalized these products as long as the cannabinoids in the products were sourced from hemp. The public has

benefited immensely due to the availability of these products, which offer relief for pain and anxiety without pharmaceuticals like prescription opioids.

82.     In a 2022 decision, the United States Court of Appeals for the Ninth Circuit expressly stated, The Farm Act "legalized the…delta -8 THC products"[9]

83.     The difference between illegal marijuana and hemp is impossible to determine by sight, touch, and smell.

84.     The only way to determine if a product is legal or illegal is through elaborate, detailed and well-designed laboratory testing conducted by specially trained chemists and lab technicians.

85.     Jason Pappas with Ohio's Police Union publicly stated to the media, "Now we have to distinguish the difference between hemp and marijuana. That's not possible for a human being to do, it has to be done through a crime analysis."[10]

86.     The State of Ohio is woefully behind the rest of the country in its ability to accurately conduct lab tests to differentiate between illegal and legal products.

---

[9] May 19, 2022 Opinion Summary *AK Futures v. Boyd Street Distro, LLC* D.C. No.8:21-cv-01027-JVS-ADS
[10] Kevin Barry, *OH crime labs can't tell the difference between hemp and marijuana, creating legal backlog* NEWS 5 CLEVELAND (Aug. 13, 2019 6:01 PM) https://www.news5cleveland.com/news/local-news/medical-marijuana/oh-crime-labs-cant-tell-the-difference-between-hemp-and-marijuana-creating-legal-backlog#:~:text=OH%20crime%20labs%20can%27t,say%20they%20warned%20lawmakers%20about.

87.     Ohio is so far behind in its testing procedures, the State Attorney General issued letters to Ohio prosecutors informing them there are no accredited labs in the State of Ohio able to test THC amounts.[11]

88.     Ohio's Attorney General stated Ohio is in the early stages of validating methods for proper testing.

89.     Since the issuance of that letter, Ohio still does not have crime labs, chemists or technicians capable of properly testing solely the levels of the illegal Delta-9-THC.

90.     Defendants' in this case certainly don't have the training or capabilities to properly conduct tests differentiating the legal or illegal levels of Delta-9-THC.

91.     The affidavit Defendant Schweitzer provided to obtain search warrants against Plaintiffs expressly stated Defendants used the Hamilton County Lab to state Plaintiffs were selling illegal Delta-9-THC.

92.     The Hamilton County Crime Lab is known for its defective testing process.

93.     The Hamilton County Crime Lab has misidentified other well-known and established drugs such as cocaine.

---

[11] Kevin Barry, *Man caught with 91 pounds of cannabis walks because police couldn't prove it was marijuana* NEWS 5 CLEVELAND *(*Jan. 29, 2020 10:41 AM) https://www.news5cleveland.com/news/local-news/man-caught-with-91-pounds-of-cannabis-walks-because-police-couldnt-prove-it-was-marijuana.  See also, Kevin Barry, *OH crime labs can't tell the difference between hemp and marijuana, creating legal backlog* NEWS 5 CLEVELAND (Aug. 13, 201) https://www.news5cleveland.com/news/local-news/medical-marijuana/oh-crime-labs-cant-tell-the-difference-between-hemp-and-marijuana-creating-legal-backlog

94.  On or about September 21, 2021, the Hamilton County Crime Lab inaccurately concluded that an antacid (Tums) was cocaine.[12]

95.  As a result of the errors of the Hamilton County Crime Lab, and innocent man was arrested for felony drug possession.

96.  Because of inaccurate testing, and overzealous police action, the innocent man was put on the ground at gunpoint and arrested.

97.  This innocent man was forced to serve a week in jail before his family could raise the money for bond.

98.  As a result of inaccurate lab testing, overzealous police action, arrest, and jailtime, (solely because the man had heartburn) he lost his job.

99.  But for the good fortune of a pro bono attorney bringing this injustice to light, this innocent man would have spent years in prison.

100.  As a result of this huge and public error by the Hamilton County Crime Lab, the laboratory underwent a mandated 6 month audit.

101.  The above referenced audit was not the first audit required as a result of inaccurate testing at the Hamilton County Crime Lab.

102.  The Hamilton County Crime Lab under went an audit the year before in 2020.

103.  The 2020 audit was triggered because the Hamilton County Crime Lab failed to fully disclose information from DNA testing, resulting in a wrongful homicide conviction.

---

[12] Jatara McGee *Hamilton County crime lab mistakes man's Tums for cocaine; Audit underway* WLWT 5 (Oct. 4, 2022) https://www.wlwt.com/article/crime-lab-error-leads-to-six-month-audit-of-drug-analysis-in-hamilton-county/41236810#

104.    The above actions took place at or near the same time period Defendants'
        were using the same crime lab to selectively enforce action – action
        previously stated by the Ohio Attorney General to prosecutors that the State
        was not equipped to take - in a racially motivated attack on Plaintiffs.

105.    Plaintiffs Wael Sharaydeh and Ismail Sharada, own and/or operate over 50
        businesses selling legally derived Delta-8-THC and Delta-10-THC
        products.

106.    Pursuant to Ohio's legalization of hemp derived products, Plaintiffs Wael
        Sharaydeh and Ismail Sharada soon thereafter began business operations
        which, within the last year, are now alleged by Defendants to be illegal
        activity.

107.    Plaintiff VIP Distribution Discount, Inc., is engaged in the wholesale
        business and purchases the hemp products directly from national suppliers
        and warehouses the products to be able to quickly, and efficiently supply
        the products to the other corporate Plaintiffs.

108.    Plaintiff VIP Distribution Discount, Inc., purchases directly from national
        suppliers such as Bloom, SOS Glass, Nirvana, Savage Enterprise, Modus
        Enterprises, Fresh Farm, Profit, Alpha Brands, White Label Leaf, and profit.

109.    The above suppliers utilize highly qualified and trained laboratories to
        properly and accurately differentiate between Delta-9-THC and the other
        cannabinoids.

110. In fact, the United States Drug Enforcement Agency (the "DEA") has established a registration process for any laboratory that tests for THC concentration.

111. The Farm Bill directed the United States Food and Drug Administration (the "USDA") to establish regulatory framework for hemp production in the United States.

112. As a result, the U.S. Domestic Hemp Production Program was established.

113. As the testing to differentiate between legal hemp and illegal marijuana is so difficult, by December 31, 2023, all labs testing THC concentration must be registered with the DEA.

114. Despite the deadline, many laboratories have already registered and obtained approval from the DEA for their testing methods.

115. Many of the suppliers named above already utilize DEA certified labs to properly test their products before they are sold to the public, like the corporate Plaintiffs herein.

116. Every time the corporate Plaintiffs purchase a product, they are provided with the laboratory report conclusively establishing the products corporate Plaintiffs purchase and sell, they receive a copy of the laboratory test.

117. In addition, the hemp derived products purchased and sold by the corporate Plaintiffs contain a QR code on the outside of the packaging.

118. Anyone, including Defendants, may scan the code and immediately receive the lab reports showing the THC concentration levels are in compliance with Federal and Ohio law.

119. Despite having the ability to immediately see the lab results and despite the Ohio Attorney General's warning that Ohio is incapable of properly testing and his statement not to prosecute, Defendants ignored the clear evidence from DEA certified labs in favor of utilizing a known defective lab.

120. The USDA issued Laboratory Testing Guidelines on January 15, 2021.[13]

121. According to the USDA Laboratory Testing Guideline, at a minimum, analytical testing of samples for total delta-9 tetrahydrocannabinol concentration levels must use post-decarboxylation or other similarly reliable methods approved by the USDA Secretary in writing. The testing methodology must consider the potential conversion of delta-9 tetrahydrocannabinolic acid (THCA) in hemp into delta-9 tetrahydrocannabinol (THC), and the test result must reflect the total available THC derived from the sum of the THC and THCA content. Current testing methodologies meeting these requirements include gas chromatography and liquid chromatography.

122. Delta-9 THCA is not illegal.

123. If the laboratories utilize unapproved methods from the USDA, inaccurate tests are likely to occur.

124. However, approved testing methods will often result in inaccurate lab results, if not conducted *perfectly*.[14]

---

[13] https://www.ams.usda.gov/rules-regulations/hemp/information-laboratories/lab-testing-guidelines
[14] Affidavit of Bethany Pridgen Attached as Exhibit 1

125.     For example, if during testing, the temperature used in the testing process reaches to high of temperature, it will often result in an inaccurate test, improperly concluding a product is over the legal Delta-9-THC level.[15]

126.     Plaintiffs are informed and believe, the Hamilton County Crime Lab uses gas chromatography testing.

127.     Gas chromatography testing is known to cause conversion of cannabinoids into THC.[16]

128.     Under the United States Constitution, Federal Law and the laws of the State of Ohio, Plaintiffs come before this Court seeking a declaration that the State of Ohio and Defendants may not initiate or continue criminal enforcement actions or civil asset forfeiture proceedings against individuals based on the sale or possession of commercial products containing cannabinoids derived from hemp.

129.     Plaintiffs also seek injunctive relief from the *ultra vires* acts of Defendants to prevent them from initiating or continuing criminal enforcement actions or civil forfeiture proceedings based on an individual or business's possession or sale of these products, as the acts are outside their lawful authority or otherwise violate the laws and Constitution.

## PLAINTIFFS' BUSINESS OPERATIONS

130.     Plaintiff VIP Distribution Discount, Inc. operates a wholesale business selling hemp derived products to the retail Plaintiffs.

---

[15] *Id.* ¶ 13.
[16] *Id.*

26

131. Plaintiff VIP Distribution Discount, Inc., purchases all of its products from national suppliers such as SOS Glass, Bloom, Nirvana, Savage Enterprise, Modus Enterprises, Fresh Farm, Profit, Alpha Brands, and White Label Leaf.

132. All products purchased by VIP Distribution Discount, Inc., come with laboratory tests specifically identifying the cannabinoids contained in the product with a break down of the percentages of each cannabinoid.

133. All of the products purchased by VIP Distribution Discount, Inc., come with a QR code on the product packaging which can be scanned with a smartphone and see a true and accurate copy of the laboratory results.

134. As stated above, the DEA has created a certification program for anyone conducting laboratory testing of hemp derived products.

135. A majority of the products purchased by VIP Distribution Discount, Inc., come with lab results from DEA certified laboratories.

136. Individual Plaintiffs Wael Sharaydeh and Ismail Sharida have ownership interests in VIP Distribution Discounts Inc., as well as the other named corporate Plaintiffs, that operate the retail stores known as VIP Smoke Shop.

137. VIP Distribution Discount, Inc., is able to purchase hemp derived products in bulk quantity and sell to the common ownership retail businesses known as VIP Smoke Shop.

138. It is estimated 5-10% of the hemp derived products on the market in the United States are counterfeit leaving retailers open to possibly selling dangerous and illegal substances.

139. By conducting business in the above manner, Plaintiffs are able to ensure the products they purchase are legal and there are no breaks in the supply chain to allow for adulteration.

## THE HEMP DERIVED PRODUCT BRANDING

140. The legal hemp derived products come in varying form such as edible products and vape cartridges.

141. The products are produced under a general business name such as "Sugar Extrax" and sold under countless product names such as "Pink Rozay" or "Carats Mint Lemonade".

142. Each national supplier sells a multitude of product names with different product names.

143. The hemp derived products with varying names that are sold by the suppliers are different in their cannabinoid profile, taste, and effect on the individual user.

144. The varying product names is akin the cola and beer markets where one supplier produces numerous 'brand names' to fit the end consumers' preferences.

145. In addition, the hemp derived products come in varying quantities and percentages of the legal cannabinoids, in the same way one beer company sells varying brands of beer with different levels of alcohol content.

## THE RAIDS

146.  On or about June 1, 2022, Defendant Warren County Sheriff's Department reportedly received information that the VIP Smoke Shop owned by Plaintiff Landen Discounts, Inc.'s business located at 2906 W 22/3 Maineville, Ohio 45039 was selling vape products to underage persons.

147.  On or about June 1, 2022, Defendant Warren County Sherriff's Department, conducted an undercover operation at VIP Smoke Shop locations.

148.  Defendant Warren County Sheriff's Department sent an underage person into Plaintiff Landen Discounts, Inc.'s business located at 2906 W US 22/3 Maineville, Ohio 45039 to purchase a vape product and/or products.

149.  Defendant Warren County Sheriff's Department sent an underage person into Plaintiff Mason Island, Inc.'s business located at 2364 Kings Center Ct., Mason Ohio to purchase a vape product and/or products.

150.  Defendant Warren County Sheriff's Department sent an underage person into Kings Smoke Shop located at 3227 US 22/3 Maineville, Ohio 45039 to purchase a vape product and/or products.

151.  Defendant Schweitzer claimed in his affidavit to obtain a search warrant that Kings Smoke Shop was part of Plaintiffs' business operations.

152.  Defendant Schweitzer stated in his affidavit that an underage person was utilized by Defendant, Warren County Sheriff Department to purchase a VIP Detlta 10 1ml vape product from Kings Smoke Shop.

153.  Kings Smoke Shop is not owned by Plaintiffs and is in fact a direct competitor of Plaintiffs.

154. Kings Smoke Shop is registed in the State of Ohio to an individual with an Arabic name.

155. Defendant Warren County Sheriff's Department sent all products purchased during the above undercover operation to the Hamilton County Crime Lab for testing.

156. Defendant Warren County Sheriff's Department and Defendant Schweitzer hoped the products would come back positive for illegal substances.

157. All products purchased on or about June 1, 2022, were under the legal limit for Delta-9-THC.

158. Not to be deterred, Defendant Warren County Sheriff's Department and Defendant Schweitzer continued to conduct numerous undercover purchases at Plaintiffs' business' known as VIP Smoke Shop.

159. After one of the undercover purchases resulted in what law enforcement believed to be a product over the Delta-9THC limit sold at a VIP Smoke Shop, they sent an undercover detective to purchase additional products.

160. According to Defendant Schweitzer, Warren County Sheriff's Department then conducted additional undercover buys with detectives.

161. Since June 2022, at the direction of Defendant Schweitzer various law enforcement departments in Southwest Ohio have made undercover buys at VIP Smoke shops inside and outside Warren County.

162. Each product purchased was sent to the same Hamilton County Crime Lab for testing.

163. Some products are alleged to have tested over the legal Delta-9-THC limit while most others tested below the legal Delta-9-THC limit.

164. The lab tests for the undercover buys of multiple purchases of the exact same brand product would come back with one package alleged over the legal Delta-9-THC limit and the other under the limit.

165. This is analogous to purchasing six 24-ounce cans of the exact same beer with one can containing 4.2% alcohol by volume and the next can containing 4.6% alcohol by volume and impossible for the retail distributors or wholesale buyers to know.

166. Plaintiffs rely on the laboratory results received from the suppliers, which a vast majority of suppliers utilize DEA certified labs.

167. Despite the fact Defendant Schweitzer and Defendant Warren County Sheriff's Department knew, or should have known, their own lab results proved Plaintiffs were not knowingly selling a product(s) alleged to have be over the legal Detla-9-THC limit, they continued to investigate VIP Smoke Shops.

168. Despite the fact Defendant Schweitzer and Defendant Warren County Sheriff's Department knew, or should have known, the products being sold by corporate Plaintiffs contain QR Codes directly on the packaging with laboratories many of which are DEA certified, they continued to investigate VIP Smoke Shops.

169. Despite the fact Defendant Schweitzer and Defendant Warren County Sheriff's Department knew, or should have known, the products being sold

by corporate Plaintiffs are the same products sold throughout the State of Ohio and across the country, they selectively targeted Plaintiffs.

170. Despite the fact Defendant Schweitzer and Defendant Warren County Sheriff's Department knew, or should have known, the products being sold by corporate Plaintiffs are the same products sold throughout many states within the United States, subject to the exact same drug laws, they selectively targeted Plaintiffs.

171. Upon information and belief, the continued selective and targeted investigation into Plaintiffs was based on their religion and ethnicity.

172. On or about December 19, 2022, Defendant Schweitzer provided affidavits to obtain search warrants in Warren County, Hamilton County, and Butler County.

173. On or about December 21, 2022, Defendant Schweitzer led a three county raid of five VIP Smoke Shops, and the personal residences of Wael Sharaydeh and Ismail Sharida.

174. On or about December 21, 2022, police conducted a raid of Ismail Sharida's personal residence, with an excessive number of armed officers that stormed the residence with raised firearms holding Sharida, his wife, and two minor children, aged six years and four years.

175. During the raid of Sharida's residence, police threatened and intimated the minor children by brandishing weapons, yelling, and telling the children their father was a drug dealer.

176. Defendant Schweitzer, and the Warren County Sheriff's Department, and/or other John and Jane Doe officers, among other things, laptops, tablets, thumb drives, cell phones, keys, and unknown amounts of cash- which was not counted- belonging to Plaintiffs Ismail Sharida, Walaa Sharida and Khadija Sharida, and/or Ismail Sharida's mother.

177. Defendant Schweitzer and other John and Jane Doe officers also seized the passports of Ismail Sharida, Walaa Sharida, their minor children, and Ismail's mother.

178. On or about December 21, 2022, Defendant Schweitzer, and the Warren County Sheriff's Department, and/or other John and Jane Doe officers, conducted a raid of a home titled in the name of Wael Sharaydeh.

179. During the raid of the Wael Sharaydeh home, Defendant Schweitzer and/or other John and Jane Doe officers seized, among other things, phones, laps, car keys, safety deposit box keys and unknown uncounted amounts of cash.

180. At some point close in time, Defendant Schweitzer and/or other John and Jane Doe officers accessed the safety deposit box at a financial institution and seized the contents.

181. On or about December 21, 2022, Defendant Schweitzer, and the Warren County Sheriff's Department, and/or other John and Jane Doe officers conducted raids at the retail business locations of Franklin Discounts, Inc., Landen Discounts, Inc., Lebanon Discounts, Inc., Mason Island, Inc., Mason King's Discount, Inc. as well as the wholesale warehouse of VIP Distribution Discount, Inc.

182. In all said business operation raids, Defendant Schweitzer, and the Warren County Sheriff's Department, and/or other John and Jane Doe officers conducted the search with an excessive number of officers and intimidation tactics.

183. In all said business operation raids, Defendant Schweitzer, and the Warren County Sheriff's Department, and/or other John and Jane Doe officers seized all cash found and did not include the amount of cash on the property inventory.

184. On the property inventory Defendant Schweitzer, and the Warren County Sheriff's Department, and/or other John and Jane Doe officers provided to Plaintiffs, they did not list the specific products seized.

185. As noted above, Sugar Extrax is a manufacturer/supplier of numerous brands of hemp derived products.

186. Rather than list the products seized, Defendant Schweitzer and/or other John and Jane Doe officers listed on the inventory overly broad product seizure list such as '610 Sugar Extrax, 335, Medusa carts, 370 Cake Carts'.

187. The specific product seized is of great importance as it is the only way to trace a product's history back to the original source and laboratory results.

188. Each hemp derived product purchased and then sold by Plaintiffs contains a SKU code which allows the product's source history to be identified.

189. Without a specific inventory of each product, Plaintiffs are prevented from conclusively proving the products have been tested by qualified laboratories, including the DEA certified labs.

190.    In total Defendant Schweitzer and/or other John and Jane Doe officers seized what is approximated to be over $500,0000 worth of products.

191.    In total Defendant Schweitzer, and the Warren County Sheriff's Department, and/or other John and Jane Doe officers seized unknown large amounts of cash.

192.    After seizing the property of Plaintiffs, Defendant Schweitzer, and the Warren County Sheriff's Department, and/or other John and Jane Doe officers officers have held the property for over four months without criminal charges, an accounting of the cash, or identification of specific brands, QR codes, or SKU codes.

193.    Upon information and belief, Defendant Schweitzer, and the Warren County Sheriff's Department, and/or other John and Jane Doe officers began testing the concentration levels of Delta-9-THC of the seized products in an unqualified and/or incorrect manner.

194.    Despite the fact Defendant Schweitzer, and the Warren County Sheriff's Department, and/or other John and Jane Doe officers have maintained dominion and control over the seized products for over four months without any criminal charges, they continued their selective and targeted investigation, enforcement and raids of corporate Plaintiffs.

195.    On or about April 10, 2022, Defendant Schweitzer, and the Warren County Sheriff's Department, the Montgomery County Sheriff's Department, Greene County Sheriff's department and/or other John and Jane Doe

officers conducted numerous raids on Plaintiffs' retail businesses and VIP Distribution Inc.'s warehouse.

196. At the time of the warehouse raid, a delivery truck arrived. Without legal authority, Defendants John and Jane Doe officers attempted to illegally search the delivery truck.

197. But for the presence of an attorney working on behalf of Plaintiffs, Defendants John and Jane Doe officers would have committed another constitutional violation by illegally searching the delivery truck.

198. On or about April 10, 2023, Defendants John and Jane Doe officers acting pursuant to direction from Defendant Schweitzer and the Warren County Sheriff's Department conducted a raid on VIP Discount Inc., located at 7014 Vine Street Cincinnati, OH 45216 seizing large quantities of products and again un-counted sums of cash.

199. During the raid at 7014 Vine Street, Defendants John and Jane Doe officers acting pursuant to direction from Defendant Schweitzer and the Warren County Sheriff's Department, with excess force threatened and intimidated Plaintiff Maria Jax-Ortiz, an employee working at the retail business.

200. Defendants John and Jane Doe officers acting pursuant to direction from Defendant Schweitzer and the Warren County Sheriff's Department, threatened to incarcerate her and seize her car and attempted to search her personal vehicle. This attempted search was clearly outside the parameters of the search warrant, against the law and against applicable police policies, training and protocol.

201.    Defendants John and Jane Doe officers acting pursuant to direction from Defendant Schweitzer and the Warren County Sheriff's Department proceeded to seize $10,200.00 in cash and her legally owned firearm in violation of this Plaintiff's constitutional rights.

202.    On or about April 10, 2023, the TCSU, acting upon information received from Defendant Schweitzer, the Warren County Sheriff's Office conducted raids at four smoke shops in the Dayton, Ohio area.

203.    The April 10, 2023, raids were conducted by The Montgomery County Sheriff's Department and Greene County Sheriff's Department and/or West Carollton Police Department.

204.    During one of the raids Defendants John and Jane Doe officers seized VIP Smoke Shop employee Ryhman Farah's necessary life saving medication.

205.    Mr. Farah must take his medication three times a day and have the medication with him while working.

206.    Mr. Farah informed Defendants conducting the raid of his medical condition and despite this information and the obvious prescription label identifying the medication and the person for whom it was prescribed, police informed Mr. Farah, they were confiscating his medication. This seizure was clearly outside the parameters of the search warrant, against the law and against applicable police policies, training and protocol.

207.    If Mr. Farah does not have access to his medication he could suffer acute chest syndrome and die within minutes.

208.   During the raid of VIP Smoke shop retail store located at 9144 Dayton Lebanon Pike Centerville, Ohio, Defendants John and Jane Doe officers, and County Sheriff's Department opening mocked a VIP Smoke Shop employee, ignored the threat their actions could have on Mr. Farah's life and openly mocked him for his accent and religion.

209.   During said raid, Defendants conducting the search noticed a poem written in Arabic on the wall of the store.

210.   Defendants conducting the raid, laughed that this was the Taliban.

211.   In addition to the actions of Defendants conducting the raid, the belief a poem written in Arabic was related to the Taliban, demonstrated Defendants religious, racial, and ethnic basis as the primary language of the Taliban is not Arabic but predominately Poshtu, and to a much lesser extent Dari, both Farsi based languages and completely different from the Arabic language.

212.   Lingusitically, German and French are more similar to each other than Pashtu or Dari is to Arabic.

213.   In addition, the individuals being ridiculed by Defendants are of a completely different ethnicity, religious, language, cultural beliefs and geographic location than the Taliban.

214.   Further showing the religious, racial, and ethnic bias of Defendants in this litigation, the one lone business selling hemp derived products that was raided on April 10, 2023, that was not owned or controlled by Wael Sharaydeh and Ismail Sharida was Springboro Vape & Smoke Shop.

215. The Springboro Vape & Smoke Shop shares the common 'Springboro' name of Plaintiff Springboro Discount, Inc., and another former business of Mr. Sharaydeh and Ismail Sharida named Springboro Wireless.

216. The owner of the lone store raided on April 10, 2023, not associated with Plaintiffs, is owned by an individual with an Arabic surname.

217. Further showing the religious, racial, and ethnic bias of Defendants in this litigation, Kings Smoke Shop listed in Defendant Schweitzer's affidavit was not owned or controlled by Wael Sharaydeh and Ismail Sharida was Springboro Vape & Smoke Shop but another individual with an Arabic name.

218. To the best of Plaintiffs knowledge, information, and belief, only their stores and two other stores owned by individuals with Arabic names were raided.

219. As highlighted by Defendant Schweitzer's affidavit, he believed, at minimum, Kings Smoke Shop was owned by Wael Sharaydeh and Ismail Sharida.

220. On or about April 16, 2023, Plaintiffs learned that Defendants John and Jane Doe officers, the Montgomery County Sheriff's Department and/or the Greene County Sheriff's Department froze all bank accounts under the control of Wael Sharaydeh, including his personal account.

221. The Defendants that froze the bank accounts did not have legal authority to place a freeze on said accounts.

222. Defedants actions in seizing the accounts constituted an unlawful taking, and deprived Plaintiffs of their property.

223. On or about April 24, 2023, the Defendants that froze the bank accounts released the freeze on some accounts but are maintaining they have legal authority to freeze and/or seize/hold the bank accounts of Centerville Discount, Inc., Springboro Discount Inc., and Wael Sharaydeh's personal accounts.

224. On or about April 10, 2023, the Defendants that conducted the raid on the VIP Smoke Shop located at 4443 West Franklin Street, in Greene County, Ohio, seized numerous products and unknown, unaccounted for cash.

225. The Defendants conducting said raid at 4443 West Franklin provided an inventory of property taken that was incomplete and inaccurate. Defendants seized well over 500 products not included in the inventory. See Attached Exhibit 2.

## COUNT I – INJUNCTIVE RELIEF

226. Plaintiffs hereby incorporate by reference the preceding allegations as if fully set forth herein.

227. Plaintiffs state this cause of action against Defendants in their official capacities, and Defendant Schweitzer in both his individual capacity and capacity as an employee of Defendant Warren County Sheriff's Department, for purposes of seeking declaratory and injunctive relief.

228.    Plaintiffs have alleged below several violations of constitutional rights based upon Defendants unlawful searches and seizures described within this complaint.

229.    Plaintiffs seek an order from this Court enjoining Defendants from searching and seizing Plaintiffs property to include products, based upon the allegations that the Plaintiffs products described within this Complaint, contain concentrations above limits authorized by Federal and Ohio law as more fully set forth within this complaint.

**COUNT II – VIOLATION OF 42 U.S.C. § 1983**
**FIRST AMENDMENT – FREE EXERCISE OF RELIGION**

230.    Plaintiffs hereby incorporate by reference the preceding allegations as if fully set forth herein.

231.    Defendants at all times relevant to this action were acting under color of law. Defendant Schweitzer acted in both his individual capacity and capacity as an employee of Defendant Warren County Sheriff's Department, and did so under color of law in both capacities.

232.    For Individual Plaintiffs, observation of the pillars of Islam is an activity protected under the First Amendment of the U.S. Constitution.

233.    The First Amendment's Freedom of Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits censorship of private religious expression.

234.    Upon information and belief, Plaintiffs' exercise of a protected right was a substantial and motivating factor in Defendants' selective, targeted, willful, wanton, and reckless conduct that was exercised with malicious purposes

and bad faith in their attempts to run all VIP Smoke Shops owned by Individual Plaintiffs, Wael Sharaydeh and Ismail Sharida out of town.

235.   Upon information and belief, Detective Schweitzer and the other Defendants actions as described throughout this Complaint, were in retaliation for Wael Sharaydeh and Ismail Sharida's exercise of their right to practice Islam.

236.   Based on actions of Defendants of openly mocking employees' accents, calling them the Taliban, and only selectively enforcing and targeting Plaintiffs' businesses, Plaintiffs believe Defendants' actions described throughout this Complaint were based upon malice, hatred, revenge, a spirit of ill will and/or with reckless or callous indifference to the federally protected rights of Plaintiffs.

237.   Defendants' actions deprived Plaintiffs of their rights, privileges, and immunities provided by the U.S. Constitution, more specifically the right to the free exercise of religion as secured by their First Amendment to the U.S. Constitution and enforced through 42 U.S.C. § 1983.

238.   Plaintiffs have suffered damages including loss of income, loss of legal products, loss of reputation, pain and suffering, and mental and emotional distress.

239.   As a direct and proximate cause of Defendants' deprivation of Plaintiffs' constitutionally protected right, Plaintiffs have been damaged.

### COUNT III – VIOLATION OF 42 U.S.C. § 1983

## FOURTEENTH AMENDMENT – VIOLATION OF THE EQUAL PROTECTION CLAUSE

240. Plaintiffs hereby incorporate by reference the preceding allegations as if fully set forth herein.

241. The Individual Plaintiffs' observation of the pillars of Islam is an activity protected under the First Amendment of the U.S. Constitution.

242. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

243. By discriminating against the Plaintiffs based upon their religious beliefs, Defendants are treating Plaintiffs differently than other similarly situated private individuals on the basis of their religion, a protected classification.

244. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on religion is presumptively unconstitutional and subject to heightened scrutiny

245. Defendants lack a rational or compelling state interest for such disparate treatment of Plaintiffs as a result of their religious beliefs.

246. Defendants' discrimination against Plaintiffs is not narrowly tailored to serve a compelling state interest.

247. Accordingly, Defendants' treatment of Plaintiffs on the basis of their religious beliefs violates Plaintiffs' right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.

248. As a direct and proximate cause of Defendants' deprivation of Plaintiffs' constitutionally protected right, Plaintiffs have been damaged.

## COUNT IV- VIOLATION OF 42 U.S.C. § 1983
## FOURTH AMENDMENT – UNREASONABLE SEARCH AND SEIZURE

249. Plaintiffs hereby incorporate by reference the preceding allegations as if fully set forth herein.

250. Defendants at all times relevant to this action were acting under color of law.

251. Defendants and their employees and agents violated Plaintiffs' Fourth Amendment rights to be free from unreasonable seizure of their property by confiscating their federal and state legal property.

252. The unlawful actions were done with the specific intent to deprive Plaintiffs of their constitutional rights to be secure in their property.

253. Defendants are informed and believe that the acts of Defendants and their employees and agents were intentional in seizing legal property and that, at minimum, Defendants were deliberately indifferent to the likely consequence that Plaintiffs' legal property would be seized and Plaintiffs unable to conduct business.

254. As a direct and proximate cause of Defendants' deprivation of Plaintiffs' constitutionally protected right, Plaintiffs have been damaged.

## COUNT V – VIOLATION OF 42 U.S.C. § 1983
## FIFTH AND FOURTEENTH AMENDMENTS

255. Plaintiffs hereby incorporate by reference the preceding allegations as if fully set forth herein.

256. Defendants at all times relevant to this action were acting under color of law.

257. Defendants at all times relevant to this action were acting under color of law.

258. Defendants, their employees and agents, owed Plaintiffs a duty under the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution to protect the property of Plaintiffs.

259. Despite this well-defined duty, Defendants provided no notice that their property was at risk of being seized and did not act to preserve the property or provide means of reclaiming the property in a timely manner.

260. In fact, Defendant Schweitzer was provided evidence that vehicles he seized, some of which Defendants did not even list on the inventories, was purchased prior to Plaintiffs involved with the hemp industry, and he and/or other Defendants have refused to return the vehicles.

261. Defendants have seized the property of Plaintiffs without due process, lawful justification, or compensation.

262. As a direct and proximate result of Defendants, their agents and employees, Plaintiffs have suffered and continue to suffer loss of their property and are entitled to compensatory damages for their property and other injury.

**COUNT VI- VIOLATION OF 42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT STATE CREATED DANGER**

263.   Plaintiffs hereby incorporate by reference the preceding allegations as if fully set forth herein.

264.   By taking the lifesaving medication of Plaintiffs' employee's medication, that was clearly marked and outside the scope of the search warrant, Defendants, their employees and agents, have created a danger to Plaintiffs and their employees. As a direct and proximate result of Defendants, their agents and employees, Plaintiffs have suffered and continue to suffer loss of their property and are entitled to compensatory damages and other injury.

## COUNT VII- REPLEVIN

265.   Plaintiffs hereby incorporate by reference the preceding allegations as if fully set forth herein.

266.   Defendants at all times relevant to this action were acting under color of law.

267.   Defendants are in possession of numerous items belonging to Plaintiffs. The specific items are set forth in the search warrants referenced herein. However, as previously set forth above, Defendants failed to fully and properly identify seized items and quantities. Plaintiffs will be able to more fully describe the items they are seeking after engaging in discovery. At present, the items include products from the store valued in excess of $500,000, a 2017 BMW X6 with VIN 5YMKW8C53HOR439767 having an estimate value of approximately $70,000, a 2017 Ford Mustang with

VIN 1FATP8FFXH5290593 having an estimated value of $17,000, and US currency in an amount in excess of $100,000.

268. The property described in the preceding paragraph is in the hands of the various Defendants with the exact location unknown to Plaintiffs at the time of filing. Plaintiffs will be able to update the location of the subject property after engaging in discovery.

269. Plaintiffs have set forth the facts regarding the seizure of the various items of the subject property above and why Plaintiffs are entitled to possession.

270. In addition to federal law, Ohio law specifically holds that replevin is a statutory remedy. America Rents v. Crawley, 77 Ohio App.3d 801, 804, 603 N.E.2d 1079 (10th Dist.1991). "A replevin suit simply seeks to recover goods from one who wrongfully retains them at the time the suit is filed. Replevin does not even require an 'unlawful taking.' The plaintiff in replevin need only prove that he is entitled to certain property and that the property is in the defendant's possession." Wysocki v. Oberlin Police Dept., 9th Dist. No. 13CA010437, 2014-Ohio-2869, ¶ 7, quoting Wilson v. Jo-Ann Stores, Inc., 9th Dist. No. 26154, 2012-Ohio-2748, ¶11 (citation omitted).

271. On multiple occasions which are set forth above, Defendants took possession of the Property belonging to Plaintiffs.

272. Plaintiffs are entitled to the immediate possession of the Property, currently in the possession of the various Defendants.

273. Plaintiffs have requested the return of the Property, but Defendants have failed to return all property as requested.

## COUNT VIII - CONVERSION

274. Plaintiff hereby incorporates by reference the preceding allegations as if fully set forth herein.

275. Defendants at all times relevant to this action were acting under color of law.

276. Defendants are in possession of numerous items belonging to Plaintiffs. The specific items are set forth in the search warrants referenced herein. However, as previously set forth above, Defendants failed to fully and properly identify seized items and quantities. Plaintiffs will be able to more fully describe the items they are seeking after engaging in discovery. At present, the items include products from the store valued in excess of $500,000, a 2017 BMW X6 with VIN 5YMKW8C53HOR439767 having an estimate value of approximately $70,000, a 2017 Ford Mustang with VIN 1FATP8FFXH5290593 having an estimated value of $17,000, and US currency in an amount in excess of $100,000.

277. The property described in the preceding paragraph is in the hands of the various Defendants with the exact location unknown to Plaintiffs at the time of filing. Plaintiffs will be able to update the location of the subject property after engaging in discovery.

278.     Plaintiffs have set forth the facts regarding the seizure of the various items of the subject property above and why Plaintiffs are entitled to possession.

279.     Pursuant to RC. 2737.14, "[i]f delivery of the property cannot be made, the action may proceed as a claim for conversion upon due notice being given the respondent of the date, time, place, and purpose of the hearing upon such claim."

280.     Plaintiffs are the owner of the Property described in this Complaint.

281.     Plaintiffs are entitled to the immediate possession of the Property.

282.     Defendants have deprived Plaintiffs of possession of the Property by the exercise of dominion over that property inconsistent with the right of possession of Plaintiffs.

283.     Defendants' retention of the property after Plaintiffs request for its return constitutes conversion, because Defendants have intentionally exercised dominion and control over Plaintiffs Property that so seriously interferes with Plaintiffs right to its possession that Defendants should be required to pay Plaintiff the full value of the Property.

**WHEREFORE**, Plaintiff demands:

1.     That Defendants, and all officers, agents, servants, employees, and attorneys and all those persons in active concert or participation with Defendants, be for with preliminary and thereafter permanently enjoined and restrained from:

a. Raiding Plaintiffs' stores based upon alleged violations of Ohio drug laws as they specifically relate to those allegations set forth in prior search warrants, or otherwise stated herein.

b. Seizing Plaintiffs' property based upon alleged violations of Ohio drug laws as they specifically relate to those allegations set forth in prior search warrants, or otherwise stated herein.

c. Retaining Plaintiffs' property based upon alleged violations of Ohio drug laws as they specifically relate to those allegations set forth in prior search warrants, or otherwise stated herein.

3.      That Defendants be required to deliver up and return all devices, inventory, cash, automobiles and other property of Plaintiffs described above.

4.      That Plaintiff be awarded an amount in excess of $75,000.

5.      That Plaintiffs be awarded pre and post judgment interest.

6.      That Plaintiffs recover costs in this suit.

7.      That Plaintiffs recover attorney fees in this suit.

8.      That Plaintiffs have such other and further relief as the Court may deem just.

__/s/ Jeff J. Cornwell_____
Jeff J. Cornwell (OH-0080828)
Attorney for Plaintiffs
315 S. Monument Ave.
Hamilton, OH 45011
513-520-1808
Jeff@cornlegal.com

**BRANDABUR LAW, LLC**

 */s/  Michael J. Brandabur*
Michael J. Brandabur (OH #0067246)
Attorney for Plaintiffs
315 South Monument Ave. Hamilton, OH 45011
Telephone: (513) 275-9346/Fax: (513) 275-9347
E-mail: Michael@BrandaburLaw.com

## JURY DEMAND

Plaintiffs herein request this court empanel a jury to hear the within cause of action.

_____/s/ Jeff J. Cornwell_____
Jeff J. Cornwell (OH-0080828)